In the Interest of Mark ROBBINS et al., Kester Robbins and Donna Robbins, Appellants.

No. 2–57760.

Supreme Court of Iowa.

June 25, 1975.

R. Michael Sweesy, Mason City, for appellants.

Richard C. Turner, Atty. Gen., Lorna Lawhead Williams, Sp. Asst. Atty. Gen., Michael P. Murphy, Asst. Atty. Gen., and Phillip N. Norland, County Atty., for appellee State of Iowa.

John H. Greve, Northwood, for appellee children.

Heard by MOORE, C. J., and MASON, REES, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

This is an appeal by the parents from a trial court decree terminating the parent-child relationship between them and their four children. We affirm the trial court.

The children involved are Mark, age 10, Michael, age 9, Donald, age 7, and Kimberly, age 3. The parents are Kester and Donna Robbins. Their marriage had been

dissolved by the time the termination decree was entered, although Kester continued to reside with Donna. Their home is in Kensett, in Worth County.

Two grounds for termination were alleged in the petition. One ground was an alleged substantial, continuous or repeated refusal of the parents to give the children necessary parental care and protection. § 232.41(2)(b), The Code. The other ground was an apparent attempt to paraphrase § 232.41(2)(d), The Code, which authorizes termination when parents are shown to be unfit by reason of certain conduct found by the court to be detrimental to the physical or mental health or morals of their children.

The trial court terminated the parental relationship on the first ground and on a ground not alleged in the petition, a finding under § 232.41(2)(e), The Code, "That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination." This ground was not alleged by the State even though the trial court did make a finding the children were neglected and dependent after the first of the three hearings in the case.

I. The parents contend they were denied due process of law under Amendment 14, United States Constitution, when the court found a basis for termination not alleged in the petition and of which they had no written notice. It is a denial of due process to adjudicate a termination of parental rights on a ground of which the children and parents have not had proper notice. In re Meyer, 204 N.W.2d 625 (Iowa 1973), and citations. Therefore, we agree with the parents that, even if established in the evidence, the statutory ground under § 232.41(2)(e) may not serve as a basis for affirmance of the trial court's decree.

II. We find it unnecessary to decide whether the second ground alleged in the petition properly stated a basis for termination under § 232.41(2)(d), which, although not relied on by the trial court, would have justified termination.

We think the controlling question is whether the evidence is sufficient to support termination based on the pleaded ground relied on by the trial court, a substantial and continuous or repeated refusal by the parents to give the children necessary care and protection.

We review the evidence de novo. General principles applicable to our review are summarized in In Interest of Kester, 228 N.W.2d 107, 109 (Iowa 1975), and need not be repeated here.

The three trial court hearings in this case produced 475 pages of transcript and numerous exhibits. The hearings were held July 23, 1973, June 24, 1974, and September 24, 1974.

The evidence in the first hearing showed the family first came to the attention of social services authorities in 1969 when Donna's mother, Grace Helmich, requested assistance for Donna from the Homemaker Health Aide Service. The homemaker service exists to provide guidance in household management. However, the homemakers sent to the Robbins home found they were doing maid service. Donna listened to them but refused to follow either their example or advice. She let them clean house and fix meals for her.

This service continued for three years, including more than 1000 hours of work. Reports were prepared by the workers after each visit. The reports of three homemakers were received in evidence. We agree with and adopt the trial court's characterization of these reports:

"Most of the visits by these ladies were made in the mornings, starting at nine o'clock a. m. In a vast number of cases none of the family was up when the homemaker arrived. In nearly all cases the homemaker was required to make breakfast for the family and before she could do so had to wash an accumulation of dirty dishes. On numerous occasions, Kester was not home when the homemak-

er arrived and had not been home during the night. When he was home, he was often in bed, would arise late in the morning for breakfast and then return to bed. Great accumulations of dirty dishes awaited the homemaker on each occasion, frequently all the dishes, pots and pans in the house were dirty. There was a stench about the place on numerous occasions, partly due to dog and cat mess, the family not making any provision for the animals and keeping all of the animals confined primarily to the home. Dirty clothing was strung about the house, as were toys of the children. There was evidence that the children were undisciplined, with both parents screaming at them frequently. There were frequent arguments between Mr. and Mrs. Robbins and there was evidence on occasion that Mr. Robbins had physically abused the mother.

"During the approximate three-year period that the homemakers visited the Robbins home, Donna was frequently ill, almost in a state of exhaustion and appeared to be overwhelmed by her duties as a housekeeper and mother. She showed a dependence on medication, taking various medications throughout the day. Pills were strewn about the house and were readily available to the children. Efforts by the homemakers, the county nurse and various social workers to persuade Donna to lock up the pills proved to be unavailing.

"The children were frequently ill with colds and sometimes experienced high temperatures. However, the last physical examination of the children showed them to be in good physical condition. The mental condition of the three boys is another matter.

"During the three years that the homemakers were assisting this family, the deplorable conditions which existed at the beginning continued to exist to the very end of the homemaker visits. On infrequent occasions, there was evidence that Donna had made an attempt to clean up

the house before the homemakers' arrival. During the period in 1970 when Kester and Donna were temporarily separated for a period of about three weeks, there was a noticeable improvement in the home conditions. But overall Donna remained unable to organize her housework, to plan meals or to properly raise the children. It was realized that the homemaker was furnishing maid service only to the family and the service was discontinued after Donna refused to follow a schedule set up for her."

The family has received Aid to Dependent Children (ADC) benefits since shortly after the homemaker service began. Kester was physically capable of working but did not hold jobs for more than a few weeks or months at a time. He refused to share his earnings with his family. When he was home he refused to assist with household tasks and insisted on being waited on by Donna. The trial court accurately described Kester as "a brutal, ignorant and insensitive person incapable of giving guidance to his children."

The evidence showed Donna had a high school education and one year of business school. She tested in the normal range of intelligence. She has a thyroid condition for which she takes medication. She has taken a great many other pills also. On two occasions she took an overdose of sleeping pills.

As of the time of the first hearing, the deplorable home conditions had already harmed the children. Mark's school work suffered. He repeated kindergarten and spent time in special education. He had a record of absenteeism because of his parents' failure to get him to school. Psychological testing revealed he was emotionally disturbed. Since 1971 he had been with his maternal grandparents. Despite the fact conditions in that home were little better, he showed some improvement after moving there.

Michael, Donald, and Kimberly remained with the parents. They were anxious, dis-

turbed, love-starved children, already showing the effects of their deplorable environment. The trial court concluded:

"This is a true home of poverty. Not only is it economically deprived, but there is a poverty of the mind, spirit and attitude. If the home situation continues as in its present state, the court can see no future for these children."

The court held the evidence would justify termination but elected instead to proceed under § 232.47, The Code. That provision authorized the court to find the children neglected and dependent. After making such finding the court continued the proceeding for six months, leaving the children in their respective homes under supervision of the Worth County Department of Social Services. Monthly reports were ordered.

After the second hearing, held in June 1974, 11 months after the first, the trial court filed findings of fact noting the dissolution of the parents' marriage, but adding that the dissolution had not seriously changed the parental relationship because Kester continued to spend most nights in the home. Home conditions were still poor, but some slight improvement was found. The children were doing better in school. The court continued the protective supervision by the department of social services and ordered the juvenile probation officer to assist in checking home conditions.

After the court received additional reports, the third hearing was held. After that hearing the trial court made the following findings of fact:

"Two previous hearings have been held in the matter and the Findings of Fact relating thereto, filed herein on September 6, 1973 and on July 23, 1974, are adopted by reference without repetition.

"In the Findings of Fact of September 6, 1973, it was indicated that Donna Robbins would be given a chance to adequately perform as a mother, Doctor Kersten having reported, after examining both parents, that she might be able to do so in the absence of Kester. The marriage of Kester and Donna Robbins was dissolved subsequent to September 6, 1973. The dissolution has had little effect on their relationship, Kester spending many nights with Donna. Donna testified their love is stronger than ever before and they must remain together.

"Donna Robbins has had sexual relations with one Gary Knajdek subsequent to the hearing of July 23, 1973; she attributes this to her weakened resistance as a result of a vodka drink supplied by Knajdek. Donna, Kester and Knajdek have shared the same bed at the same time; the full extent of this relationship was not developed in the evidence.

"The conditions in the home have not changed. The same filth and lack of housekeeping, shown in the hearing held on July 23, 1973, is evident. The odor in the home, variously described in this hearing as offensive, unpleasant, nauseating and putrid, remains. Mrs. Helmich's testimony that this was due to cat manure in the upstairs is not believed by the court, the witness not being credible in this respect or in many other respects.

"The children are below par insofar as their weight, size and muscular development are concerned. There is evidence that they do not have a proper diet. They are emotionally insecure.

"There is a possibility of food poisoning in this home, primarily from the lack of sanitation in the home and the poor housekeeping practices.

"The mother, Donna, is frequently nervous, tired and the home situation appears to be too much for her. She is unable to organize her housework, with the result that little of it is done. She does the best she can, but appears either not to know what should be done in caring for her household and children, or is incapable of performing such duties.

"The court finds that there has been no change in the deplorable conditions which existed on July 23, 1973. The home continues to be filthy, the children continue

to be undisciplined; they continue to be socially and emotionally deprived. The only area in which the children have shown slight improvement is in school, and the parents can take no credit therefor. The repeated efforts of the various agencies dealing with this family in an effort to improve the situation have totally failed. Any further efforts in this area are also doomed to failure.

"The court further finds that the parents have substantially and continuously refused to give the children necessary parental care and protection."

The parents do not challenge the sufficiency of the evidence to require termination of Kester's parental rights on the ground of his substantial and continuous refusal to care for and protect the children. The evidence establishes that his parental rights should be terminated on that ground. In Interest of Kester, supra; Re Interests of Morrison Children v. State, 259 Iowa 301, 144 N.W.2d 97 (1966).

The parents do attack the sufficiency of evidence to justify termination of Donna's parental rights on that ground. In doing so they have seized upon the trial court's finding in the termination decree that Donna "does the best she can, but appears either not to know what should be done in caring for her household and children, or is incapable of performing such duties." They argue Donna's failure to give the children necessary care and protection results from incapacity and not a "refusal" as required by the statute. We do not agree.

We believe the trial court was kinder to Donna than the record justifies, and the parents have put a narrower interpretation on the ground of termination than the statute justifies.

The record shows Donna to be a person with average abilities. Her physical weakness results in part from a self-induced drug dependency. Psychological testing reveals she suffers from various defects of personality. They constitute incapacity only in the sense they are deeply ingrained and unlikely to change. Donna has a weak will, but she has a will nevertheless. She makes voluntary choices. She is capable of arising at a reasonable hour in the morning; she chooses to sleep until later. She is capable of preparing meals; she prefers not to do so. She is capable of sweeping the floor and washing dishes; she elects not to do so. She knows how to wash and mend clothes; she decides not to do so. She knows Kester is a bad influence on her and the children; she keeps him in the home.

This is not a case like In re McDonald, 201 N.W.2d 447 (Iowa 1972), where the mother was incapable of making such choices.

We do not think the statute requires proof of a deliberate ultimate decision by the parent not to care for the children. We think the refusal may consist, as it does in this case, in a series of deliberate choices made by the parent which establish a pattern of living destructive to the welfare of the children. A failure of a parent to change such a pattern of behavior, when the parent has the capacity to make different decisions in these routine daily affairs, is a refusal to provide for the children's needs. In this sense, as found by the trial court, Donna has substantially, continuously, and repeatedly refused to give the children necessary parental care and attention. Her weaknesses entitled her to understanding and compassion, but they do not make her conduct involuntary.

We hold that the evidence is sufficient to require termination of the parent-child relationship on this ground.

III. The parents raise two other issues. One is urged for the first time on appeal; The other is an effort to assert purported rights of the grandparents. The first is raised too late. Schnabel v. Display Service, Inc., 219 N.W.2d 546, 548 (Iowa 1974). The other does not affect the parents' rights and cannot be asserted by them. Hagenson v. United Telephone Company of Iowa, 209 N.W.2d 76, 81 (Iowa 1973).

Affirmed.